UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 20 CR 775 |
| MARIA LOPEZ-GARCIA, | Judge Manish S. Shah |
| Defendant. | |

MEMORANDUM OPINION AND ORDER

A grand jury charged Maria Lopez-Garcia in a one-count indictment with possession with intent to distribute heroin, cocaine, and fentanyl, in violation of 21 U.S.C. § 841(a)(1). Lopez-Garcia moves to suppress evidence seized from a storage unit, along with all statements she made to law enforcement about the storage unit and its contents. For the reasons explained below, the motion is denied.

I. Background

A. Findings of Fact

I make the following findings of fact based on the evidence presented at the suppression hearing and the uncontested facts presented at the preliminary hearing and in the parties' briefs. [23], [23-1], [36], [40-1].[1]

On the morning of October 22, 2020, DEA taskforce agents put a Chicago residence at 4154 West 24th Street under surveillance based on information that it

---

[1] Bracketed numbers refer to entries on the district court docket and referenced page numbers are taken from the CM/ECF header placed at the top of filings.

contained drugs and drug proceeds. [40-1] at 11:19–12:19. Just after 11 a.m., Jose Valencia left the building, entered an SUV, and drove eastbound down 24th Street. *Id*. at 13:1–4; [23-1] at 7:13–16. Agents tailed Valencia and stopped him after he failed to signal a turn. [40-1] at 13:5–11. Valencia told agents that he and his family resided in a first-floor apartment at 4154 West 24th Street, and at the time, his two sons and two female friends from California were inside the residence. *Id*. at 14:10–16. Agents, in turn, told Valencia that they were investigating his residence for drug trafficking, and asked him if there were drugs, guns, money, drug ledgers, or scales in the residence. *Id*. at 14:17–23, 69:15–71:1. The record doesn't disclose his answer, but upon request, Valencia gave agents consent to search the apartment and signed a consent form at 11:21 a.m. *Id*. at 14:24–16:3, 69:21–71:16; Government Exhibit A.

After getting consent to search, a team of about five or six agents relocated to the apartment with Valencia. [40-1] at 16:5–12, 19:5–7. Valencia unlocked the door, and the agents asked him to step to the side and entered the apartment. *Id*. at 18:21–23. The apartment opened to family room by the door and a small hallway—with bedrooms and bathrooms on the right side—leading to a kitchen area. *Id*. at 18:24–19:2. Agents announced their office loudly and, with guns drawn, conducted a security sweep during which they encountered Valencia's two sons in separate bedrooms and Lopez-Garcia and another woman in the kitchen area. *Id*. at 16:14–23, 40:21–24, 44:14–25, 94:2–4. Three purses were on the kitchen table. *Id*. at 47:7–21. Agent Thomas Asselborn had his gun drawn at his side but slightly raised it in the direction of Lopez-Garcia as he entered the kitchen. *Id*. at 45:17–20. After this initial

2

encounter, Asselborn did not have his gun drawn while interacting with Lopez-Garcia. *Id*. at 60:20–61:6.

At Asselborn's direction, a Spanish-speaking agent asked Lopez-Garcia and the other occupants to move to the family room by the front door, and each complied. *Id*. at 17:1–18:6, 46:17–24, 94:5–10, 95:2–8. Lopez-Garcia was not free to stay in the kitchen and wasn't given a choice to bring any of the purses with her, but the agents did not touch her or any occupant while escorting them from the kitchen to the family room. *Id*. at 17:25–18:9, 47:4–12, 95:3–8. Agents asked Lopez-Garcia to sit on the couch. *Id*. at 48:4–11. Lopez-Garcia remained in the room with at least two armed agents for about twenty to thirty minutes, and she was not free to leave the room; yet she appeared calm, did not ask to leave, and agents did not formally arrest or handcuff her, or tell her that she couldn't leave. *Id*. at 19:10–16, 47:4–6, 48:6–23, 49:1–11, 50:5–16, 51:12–15, 75:15–76:1. In the family room, Spanish-speaking Taskforce Officer Rigoberto Amaro asked Lopez-Garcia her name and date of birth, and he asked all the adults (Valencia, Lopez-Garcia, and the other woman from the kitchen) about their immigration status. *Id*. at 19:17–20:5, 76:5–18. Lopez-Garcia stated that she was illegally in the United States. *Id*. at 20:7, 76:12. Asselborn believed that this amounted to an admission from Lopez-Garcia that she had illegally entered the United States. *Id*. at 20:12–16.

While Lopez-Garcia was in the family room, agents searched the residence and recovered a loaded semi-automatic rifle with no serial number or maker's mark in one of the bedrooms. *Id*. at 20:17–25, 96:4–19. After recovering the rifle, Agent Daniel

3

Gainer searched a purse on the kitchen table and found Lopez-Garcia's Mexican passport, $2,488 in cash, and a swipe card and key for a U-Haul storage unit. *Id*. at 21:1–15, 96:23–97:5. Agents did not ask Lopez-Garcia—or any other occupant—for permission to search the purses. *Id*. at 49:21–50:4, 105:25–106:3.

Amaro asked Lopez-Garcia if she would walk to the kitchen to speak with him. *Id*. at 76:25–77:1. She joined Amaro and Asselborn in the kitchen, and Amaro asked her about the U-Haul swipe card and key. *Id*. at 21:16–19, 77:9–11. Lopez-Garcia said that the key was hers and she was renting the unit for personal belongings, but there was nothing in the unit; Amaro then asked Lopez-Garcia for consent to search the unit and she provided verbal consent. *Id*. at 21:20–22:3, 77:12–13, 78:8–10. Amaro then wrote the address of the U-Haul unit on a Spanish-language consent form, explained the form to Lopez-Garcia, and gave her time to read it. *Id*. at 22:4–23:3, 57:22–58:13, 77:14–79:3. The form affirmed in Spanish that the signer was not threatened or forced and freely consented to the search. *See* Govt. Ex. B. Lopez-Garcia asked Amaro where she should sign, and at 12:12 p.m., Lopez-Garcia signed the consent form. [40-1] at 79:3–14; Govt. Ex. B. Amaro and Asselborn then signed the form. [40-1] at 79:15–17; Govt. Ex. B.

Someone asked Lopez-Garcia if she would accompany agents to search the storage unit, and she agreed to go with the agents. [40-1] at 23:16–20. Lopez-Garcia sat in the backseat of a minivan and rode to the facility with three armed agents—Amaro, Gainer, and a third agent. *Id*. at 25:3–10, 51:20–52:19, 84:5–19. Her purse remained in the kitchen. *Id*. at 24:24–25:2. While Lopez-Garcia was not free to leave

4

the van during transport, no agent placed hands on her or unholstered their gun, she remained calm and was not handcuffed, and agents communicated in a normal tone of voice and did not yell at or threaten her. *Id*. at 23:21–24:3, 80:1–19, 84:23–85:5, 97:22–98:21. When they arrived at the U-Haul facility, agents searched the storage unit and found nothing inside. *Id*. at 24:7–10, 53:3–7, 80:20–24, 99:18. They then returned to the residence. *Id*. at 80:25–81:2. The entire trip to the U-Haul facility— from the time agents and Lopez-Garcia left to the time they returned to the residence—lasted about 15 to 20 minutes. *Id*. at 24:11–13, 52:20–23.

While the three agents and Lopez-Garcia went to the storage unit, other agents continued searching the residence and found a Nissan Murano key fob hanging on the wall inside the front door. *Id*. at 24:14–19, 54:20–24. Valencia's older son, who was in his 20s, told agents that the Nissan parked on the street in front of the residence was his mother's. *Id*. at 25:17–25. By that point, the agents and Lopez-Garcia had returned from the storage unit, and Asselborn and Amaro received verbal consent to search the Nissan from Jose Valencia and his son. *Id*. at 26:1–9. Agents then searched the vehicle and found a silver case in the back pocket of the driver's seat; the case contained another swipe card and key for another U-Haul storage unit, with a piece of paper taped to it that said "1034." *Id*. at 26:10–23. After finding the swipe card and key, Asselborn asked Valencia, his son, and the other woman if the swipe card and key belonged to anyone. *Id*. at 27:9–28:1.

Upon their return from the storage-unit search, Asselborn also asked Amaro to read Lopez-Garcia her *Miranda* rights because she had been cooperating. *Id*. at

5

29:1–8. Lopez-Garcia was brought back inside the apartment, but she asked to go outside to have a cigarette. *Id.* at 29:9–14. Because she was cooperating, agents wanted to keep her separate from the other occupants, so Amaro and Lopez-Garcia went out to the front porch, and he *Mirandized* her as Asselborn stood by. *Id.* at 29:9–22, 30:4–9, 55:23–56:1, 85:6–22. Amaro read Lopez-Garcia her rights in Spanish from a pre-printed card, and Lopez-Garcia said that she understood her *Miranda* rights. *Id.* at 81:3–15. She then told Amaro that she was waiving her rights and told agents she was willing to answer questions and wanted to cooperate fully with law enforcement. *Id.* at 30:25–31:6, 81:16–18. Lopez-Garcia smoked a cigarette and appeared relaxed as she continued to talk with agents. *Id.* at 81:21–82:1. She did not ask to leave or indicate she was in distress, and officers did not place her in handcuffs at that point. *Id.* at 31:7–17. Agents then asked Lopez-Garcia about the second storage key; she initially denied knowledge of the unit, but with a little further (unspecified) questioning, she told Amaro that agents "would find what [they] were looking for in there." *Id.* at 31:18–24, 82:2–5. She later told Amaro that the unit contained a black suitcase with ten kilograms of cocaine. *Id.* at 32:1–4.

After Lopez-Garcia made these statements, agents asked for her consent to search the second storage unit. *Id.* at 32:5–6, 82:6–8. Lopez-Garcia verbally consented to the search of the second unit about five minutes after she returned from the search of the first unit (and about an hour and fifteen minutes after her first encounter with agents in the kitchen). *Id.* at 32:8–10, 33:12–14, 34:20–22, 35:20–25, 61:23–62:2. Amaro added the second storage unit's address to the consent form Lopez-Garcia had

6

earlier signed; Amaro then showed Lopez-Garcia the form and explained why he added the second address. *Id.* at 32:12–25, 58:23, 82:10–24, 89:21–22; Govt. Ex. B. Lopez-Garcia reviewed the form and verbally agreed that Amaro could add the second unit to her earlier-signed consent form. [40-1] at 33:1–3, 33:15–17, 60:13–16, 82:20–24. But she did not re-sign the form, sign a new form, or initial Amaro's changes. *Id.* at 33:4–5, 38:5–13, 60:9–12, 62:20–63:6, 86:10–17. Lopez-Garcia remained calm throughout the encounter, did not appear distressed or ask to leave, and she was not handcuffed at any point before giving consent to search the second unit. *Id.* at 36:10–21, 101:1–5.

Agents left the residence for the second storage unit—this time without Lopez-Garcia—and recovered kilogram quantities of cocaine, heroin, and fentanyl. *Id.* at 33:21–22; [23-1] at 18:14. Lopez-Garcia remained at the house and was not free to leave while the agents searched the second unit. [40-1] at 57:3–10. The search took about five minutes. *Id.* at 56:22–57:1. After agents notified Asselborn of the unit's contents, he arrested Lopez-Garcia. *Id.* at 36:7–8, 57:1–2. Lopez-Garcia now moves to suppress all evidence seized from the second storage unit and all statements she allegedly made to agents about that unit and its contents. [23] at 1.

### B. Lopez-Garcia's Verbal Consent

In moving to suppress, Lopez-Garcia asks me to find that she did not verbally consent to the second search. She argues that the agents who testified that she consented to the search—Asselborn and Amaro—are not credible and no video or audio corroborates their testimony. [40] at 6.

7

As stated above, I find that Lopez-Garcia gave verbal consent to search the second storage unit. Amaro and Asselborn credibly testified that Lopez-Garcia provided verbal consent. Their demeanor on the stand (they were not evasive and answered questions forthrightly) and the context in which Lopez-Garcia provided consent bolsters the trustworthiness of their testimony. Lopez-Garcia remained calm and spoke willingly with agents throughout the encounter. There's no dispute that she consented to the search of the first unit, and after that search, she continued to cooperate with agents and waived her *Miranda* rights. The agents also asked for and received consent several times that day from Valencia (to search the residence), Lopez-Garcia (to search the first unit and to accompany them for that search), and Valencia and his son (to search the Nissan). The record does not suggest any plausible motive for the agents to bypass consent to search the second storage unit. The agents were in a hurry, but their rush did not stop them from asking for consent at every other step in the search. Even in the absence of objective video or audio corroboration that Lopez-Garcia consented to the second search, I find the agents' testimony credible—she verbally consented.

I'm not persuaded by Lopez-Garcia's arguments to the contrary. First, she emphasizes the discrepancy between Asselborn's suppression-hearing testimony and his testimony at the preliminary hearing before the magistrate judge. At the preliminary hearing, Asselborn said Lopez-Garcia provided written consent to search the second unit and that he personally saw her sign the form. [23-1] at 15:23–24, 16:7–10. At the suppression hearing, however, Asselborn said that Lopez-Garcia did

8

not provide written consent for that unit and he knew that Amaro added the second storage unit's address to the form without getting Lopez-Garcia to re-sign or initial it. [40-1] at 38:11–13, 59:2–13. Asselborn later clarified that when he testified at the preliminary hearing that Lopez-Garcia had provided written consent to search the second unit, he meant that she verbally consented to adding the second unit to the consent form she had already signed. *Id.* at 60:13–19, 63:20–64:2. Lopez-Garcia argues that it would be unreasonable to conclude that Asselborn is telling the truth about verbal consent because he lied about written consent in the first hearing.

But Asselborn's clarification of his earlier testimony is credible and corroborated by Amaro's testimony. Moreover, Asselborn's earlier testimony does not suggest that Lopez-Garcia did not verbally consent. Asselborn was not asked—and he did not testify—about Lopez-Garcia's verbal consent to search the second unit during the preliminary hearing. He did not, as Lopez-Garcia suggests, lie about verbal consent. *See* [40] at 7. Asselborn was imprecise when he testified at the preliminary hearing that Lopez-Garcia provided written consent, but he credibly explained at the suppression hearing why he believed the consent Lopez-Garcia gave constituted written consent. He and Amaro each testified that Lopez-Garcia provided verbal consent to search the second unit and verbally agreed that Amaro could add the second unit's address to the earlier-signed consent form. That Asselborn confused the latter for written consent does not suggest that Lopez-Garcia did not verbally consent. Nothing in the record contradicts the agents' testimony regarding Lopez-Garcia's verbal consent.

In addition, Lopez-Garcia contends that Asselborn and Amaro were impeached at the suppression hearing, rendering their testimony about her consent unreliable. She highlights Asselborn's testimony that he did not follow procedure and should have had her sign a new consent form or at least initial the original form to indicate her consent. [40-1] at 63:13–19, 64:12–14. Amaro testified that he did not know whether failure to obtain a second signature or initials violated policy, but both agents said they would do things differently if they had to do it again. *Id.* at 63:13–19, 64:12–14, 86:18–25. Further, Asselborn testified that he told prosecutors he didn't follow procedures (and both agents testified that they told prosecutors they would do things differently) during pre-hearing prep sessions, but prosecutors did not disclose this information to Lopez-Garcia. *Id.* at 64:15–65:8, 87:10–88:12, 114:23–115:8, 115:20–116:5. Lopez-Garcia argues that Asselborn's testimony that he told prosecutors he violated procedures—and both Asselborn's and Amaro's testimony that they told prosecutors that they would've done things differently—is inconsistent with the prosecutors' failure to disclose those statements. The government counters that it complied with its disclosure obligations and disclosed the agents' factual recollections relating to Lopez-Garcia's consent to search the second unit. The government says that it had no duty to disclose the agents' personal reflections during mock cross examinations.

The government's decision not to disclose this information does not undermine the truthfulness of the agents' testimony. The government concedes that these issues came up during their meetings, and that is consistent with Amaro's and Asselborn's

10

testimony. Whether the government is correct that it had no duty to disclose this information to Lopez-Garcia presents a different issue, but it's one that does not bear on Asselborn's or Amaro's credibility. The agents' opinions about whether they complied with policy or would have done things differently do not imply that Lopez-Garcia withheld verbal consent or that the agents made the consent up and doctored the form to fit a false narrative.

## II. Analysis

### A. Voluntariness of Consent

Lopez-Garcia contends that any consent she provided was involuntary, rendering the government's search of the second unit unlawful. "A warrantless search is unreasonable and thus unlawful under the Fourth Amendment unless one of 'a few specifically established and well-delineated exceptions' applies." *United States v. Ahmad*, 21 F.4th 475, 478 (7th Cir. 2021) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). Consent to a search is one such exception, and the government may conduct a warrantless search if a defendant provides verbal consent to do so. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Dean*, 550 F.3d 626, 630 (7th Cir. 2008). But a consent search is "valid only if the consent was freely and voluntarily given." *Ahmad*, 21 F.4th at 478 (citation omitted). And when, as here, "a defendant claims that [she] was coerced into consenting, the Government bears the burden of proving otherwise by a preponderance of the evidence." *United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018).

To evaluate the voluntariness of a defendant's consent, courts look to the totality of the circumstances. *See United States v. Jones*, 22 F.4th 667, 675 (7th Cir. 2022). While no single factor controls, courts consider: "(1) the age, education, and intelligence of the defendant; (2) whether [she] was advised of [her] constitutional rights; (3) how long [she] was detained before consenting; (4) whether [she] consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether [she] was in custody when [she] consented." *Id.* at 676 (citation omitted). Consent is involuntary, however, "if it is tainted by 'acquiescence to authority,' … or by police misconduct that overwhelms a defendant's free will, such as 'illegal stops, detentions or arrests.'" *Ahmad*, 21 F.4th at 478 (citations omitted).

Lopez-Garcia argues that her consent was not voluntary because she was detained in violation of the Fourth Amendment. Consent to search "cannot be deemed voluntary" if the defendant consented while unlawfully detained. *United States v. Lopez*, 907 F.3d 472, 487 (7th Cir. 2018). Any reasonable person in her situation, says Lopez-Garcia, would have concluded that she was detained from the outset of the agents' search of the residence. She says she was confronted in the kitchen with at least six armed agents who forced her to move from the kitchen to the family room where one or more armed agents stood guard. In addition, three armed agents took her to the site of the first U-Haul search. She was not free to leave at any point. Putting it all together, Lopez-Garcia says, "[t]he only reasonable conclusion is that [she] had no choice but to involuntarily 'consent' to the search of the second storage unit" or risk further unlawful detention. [40] at 8. Lopez-Garcia contends that her

12

detention violated the Fourth Amendment because agents lacked reasonable suspicion or probable cause that she had committed a crime. *See* [23] at 5–9.

The government does not dispute that Lopez-Garcia was seized within the meaning of the Fourth Amendment. Instead, the government argues that (1) regardless of whether agents had reasonable suspicion or probable cause, Lopez-Garcia's detention was lawful under *Michigan v. Summers*, 452 U.S. 692 (1981), and (2) after Lopez-Garcia told agents she was illegally in the country, agents had probable cause to arrest her for the crime of illegal entry under 8 U.S.C. § 1325(a). [25] at 8–12.

The government's second contention is incorrect. Agents lacked probable cause to arrest Lopez-Garcia based on her admission that she was not legally in the country. To be sure, agents "did not need reasonable suspicion to ask [Lopez-Garcia] for her name, date and place of birth, or immigration status." *Muehler v. Mena*, 544 U.S. 93, 101 (2005). But "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012). And here, all Lopez-Garcia told agents was that she was not lawfully in the country. While 8 U.S.C. § 1325(a) makes it a misdemeanor to *enter* the country illegally, "unlawful presence in the country is not, without more, a crime." *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015). When agents know "nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona*, 567 U.S. at 407. Agents did not have probable cause to arrest Lopez-Garcia for unlawful entry based on her admission of only unlawful presence in the United States.

13

Nevertheless, Lopez-Garcia's detention leading up to her consent to the second search was lawful under *Summers*. It is reasonable for officers executing a residential search "to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705. Further, *Summers* "does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." *Bailey v. United States*, 568 U.S. 186, 193 (2013). That is, an agent's "authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Mena*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705 n.19). Detention incident to a search is appropriate "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Mena*, 544 U.S. at 98. The rule exists to prevent flight if incriminating evidence is found, minimize risk of harm to agents, and to facilitate orderly completion of a search. *See id.* And while *Summers* involved a search pursuant to a warrant rather than a consent search—and consent searches may not always pose the same dangers as warrant searches—the same analysis remains applicable. *See United States v. Enslin*, 327 F.3d 788, 797 n.32 (9th Cir. 2003).

Here, it is undisputed that agents obtained written consent to search the 24th Street residence and informed Valencia that they were looking for guns and evidence of drug trafficking. Early in the search, agents recovered a loaded semi-automatic rifle with no serial number or maker's mark in one of the bedrooms. [40-1] at 20:17–25, 96:4–19. Even with consent to search instead of a warrant, it was reasonable

14

under such circumstances for agents to exercise control over the situation and to detain occupants in the family room "for the duration of the search" to prevent flight, protect agent-safety, and ensure orderly completion of the search. *Mena*, 544 U.S. at 98; *see also Summers*, 452 U.S. at 702–03 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."). Those interests outweighed the marginal additional intrusion of detention for less than two hours without any use of physical force or handcuffs. *See Mena*, 544 U.S. at 100 (finding that even a "2– to 3–hour detention in handcuffs" did not outweigh government's continuing safety interests during a residential search).

Lopez-Garcia's agreement to accompany the agents to the first storage unit did not make her seizure unlawful. After a lawful search of Lopez-Garcia's purse yielded the key to the first storage unit,[2] Lopez-Garcia spoke with Amaro, consented to the search of the unit, and agreed to accompany the agents to the first storage facility. Agents simply asked Lopez-Garcia to accompany them and she agreed; she was not told that she had to go with agents, there weren't repeated requests, and agents made no threats or any show of force. Her decision was voluntary. *See United States v. Mendenhall*, 446 U.S. 544, 557–58 (1980); *Thurman*, 889 F.3d at 367.

---

[2] Valencia did not limit the scope of his consent to search his residence, and "[a] general consent to search the premises can include consent to search containers within it if those containers would reasonably hold the expressed object of the search." *United States v. Sawyer*, 929 F.3d 497, 500 (7th Cir. 2019). It was reasonable for agents to conclude Valencia's consent encompassed the purses found on the kitchen table that could contain handguns or evidence of drug trafficking. In any event, while the search of the purse led agents to discover the key to the first storage unit, it did not yield any contraband or evidence leading to contraband. Agents' search of the purse and first storage unit had no bearing on their discovery of the Nissan Murano key fob, which led agents to discover the second storage unit.

The trip to the first storage facility neither prolonged Lopez-Garcia's detention nor the search of the residence. Agents would have continued searching the residence whether Lopez-Garcia joined agents at the first unit or remained at the residence. Lopez-Garcia was not handcuffed during the 20-minute trip to the facility and back. And there's no evidence in the record that agents questioned Lopez-Garcia while in the van or at the first storage facility. The trip to the storage facility was voluntary and did not amount to a separate seizure. And when she returned, Lopez-Garcia continued to freely cooperate with agents on the front porch. Finally, agents had probable cause to detain Lopez-Garcia after she told them they would find what they were looking for—specifically, ten kilograms of cocaine—in the second storage unit. [40-1] at 31:22–32:4. In sum, the agents' detention of Lopez-Garcia—from her relocation to the family room to her verbal consent to search the second unit—was reasonable under the Fourth Amendment. Accordingly, her seizure does not bar consideration of voluntariness under the totality of the circumstances.

Viewing the whole record, I find that Lopez-Garcia voluntarily consented to the search of the second storage unit. Lopez-Garcia was 51 years old at the time of consent and was able to effectively communicate with Amaro in Spanish throughout. Lopez-Garcia remained calm, did not appear confused or distressed, and understood the *Miranda* warnings given before she consented to the second search. *Id.* at 28:20–31:2, 81:3–18. Although there is no other evidence about Lopez-Garcia's temperament and the agents never dealt with her before, I have no reason to infer that her calm demeanor belied some emotional turmoil undermining her capacity to consent. And

16

while she was separated from her passport and without lawful status to be in the country, her willingness to be cooperative suggests a rational approach in response to significant odds that her wrongdoing would be discovered. The circumstances establish that she was capable of providing knowing consent.

Other factors also suggest that Lopez-Garcia freely consented. Agents advised Lopez-Garcia of her *Miranda* rights before asking questions about the second storage unit, did not use any physical coercion, and asked for consent only once. While she initially denied knowledge of the second unit, "with a little further questioning" she admitted that agents would find what they were looking for and told Amaro that it was ten kilograms of cocaine. *Id.* at 31:22–32:4. After this, agents asked for consent to search once, and she immediately provided verbal consent. *Id.* at 32:5–10.

Finally, the third (length of detention) and sixth (custody) factors also tilt in favor of voluntariness. Lopez-Garcia emphasizes that she was not free to leave at any point. But even assuming Lopez-Garcia "knew [she] could not leave, it does not follow that [she] believed [she] had no choice when asked" for consent to search the second unit. *United States v. Jackson*, 901 F.2d 83, 84 (7th Cir. 1990). "[C]onsent to search can be voluntary … notwithstanding the fact that it was given while a defendant was in custody without having received *Miranda* warnings." *United States v. Renken*, 474 F.3d 984, 987 (7th Cir. 2007); *see also United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."). Moreover, even "an arrested, handcuffed suspect is capable of giving voluntary consent to [a] search." *United States v. Beltran*,

17

752 F.3d 671, 680 (7th Cir. 2014) (quoting *United States v. Figueroa*, 622 F.3d 739, 742 (7th Cir. 2010)).

Here, while Lopez-Garcia was not free to leave, the circumstances of her detention do not demonstrate that her "will had been overborne and [her] capacity for self-determination critically impaired." *Watson*, 423 U.S. at 424 (quoting *Bustamonte*, 412 U.S. at 225). The agents were armed, but that "does not vitiate consent." *United States v. Guiterrez*, 92 F.3d 468, 471 (7th Cir. 1996). After the initial encounter, agents put their guns away and never yelled at or threatened Lopez-Garcia. *See United States v. Contreras*, 820 F.3d 255, 270 (7th Cir. 2016) (initial display of force not inherently coercive). Lopez-Garcia's interactions with agents remained calm and cooperative throughout the encounter; agents did not badger her for information or consent, nor did they attempt to trick her into consenting. *See Renken*, 474 F.3d at 988; *United States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000). Although she briefly left the house to accompany agents who performed the first search, no one questioned her about the second storage unit until she returned to the residence.

Moreover, at the time Lopez-Garcia provided consent, agents had advised her of her *Miranda* rights, and she was neither placed in handcuffs nor under formal arrest. Lopez-Garcia was at Valencia's residence, smoking a cigarette on the porch while her acquaintances were inside. The entire encounter with Amaro and Asselborn on the porch lasted about five minutes. *See Renken*, 474 F.3d 988 (twelve-minute interrogation does not render consent involuntary); *see also United States v. Chavez*,

18

No. 08 CR 511-2, 2009 WL 1098696, at *2 (N.D. Ill. Apr. 23, 2009). She had been detained for a little over an hour, but that duration is not inherently coercive. *See United States v. Santiago*, No. 16-CR-686, 2018 WL 3108887, at *6 (N.D. Ill. June 25, 2018) (defendant in custody for less than two hours voluntarily consented); *United States v. Bell*, 357 F.Supp.2d 1065, 1071 (N.D. Ill. 2005), aff'd, 500 F.3d 609 (7th Cir. 2007) (consent voluntary despite defendant being in custody for five hours).

Neither Amaro nor Asselborn did anything during that encounter to coerce Lopez-Garcia or diminish her will to withhold consent. *See United States v. McClellan*, 165 F.3d 535, 544 (7th Cir. 1999) ("It is only when the police coerce the defendant's consent to make a search during an interrogation that such consent will be considered as involuntary and thus unconstitutional."). The length and circumstances of Lopez-Garcia's detention do not support a finding of involuntariness. *See Beltran*, 752 F.3d at 679 (consent freely given despite defendant being handcuffed, in custody, and not advised of constitutional rights); *United States v. Rojas*, 783 F.2d 105, 107–10 (7th Cir. 1986) (consent voluntary where seven officers displayed their weapons upon arrival at defendant's apartment, took him into custody, handcuffed him, and then separated him in a bathroom before requesting his consent).

### B. Lopez-Garcia's Statements about the Second Storage Unit

Lopez-Garcia also moves to suppress "all statements allegedly made by Ms. Lopez-Garcia to members of law enforcement about [the second] storage unit and its contents." [23] at 1. Evidence at the hearing, however, demonstrated that all of the

statements Lopez-Garcia made about the second storage unit and its contents came after she knowingly waived her *Miranda* rights. Therefore, there is no basis to suppress Lopez-Garcia's statements under *Miranda*, and for the same reasons her consent was voluntary, so too were her incriminating statements.

### III. Conclusion

Defendant's motion to suppress evidence [23] is denied. The parties shall file a status report on May 31, 2022, and state whether the case should be scheduled for trial or a status hearing. Time is excluded until June 2, 2022, under the Speedy Trial Act to serve the ends of justice. The delay is necessary to give the parties time for effective preparation, which includes review of this ruling for its effect on trial strategy, and outweighs the interests of the public and the defendant in a speedy trial.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: May 17, 2022